# Third District Court of Appeal

## State of Florida

Opinion filed June 15, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-171
Lower Tribunal No. 14-1054
_____

**Oscar F. Bernal, individually and as Personal Representative of the Estate of Renee Maria Zintgraff,**
Appellant,

vs.

**Christiane E. Marin, as Trustee of the Renee Maria Zintgraff Revocable Living Trust dated October 15, 2004,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Celeste Hardee Muir, Judge.

Golden Glasko & Associates, P.A., and William H. Glasko, for appellant.

Sloto & Associates, P.L., and Seth S. Diamond, for appellee.

Before SUAREZ, C.J., and ROTHENBERG and SCALES, JJ.

ROTHENBERG, J.

Oscar F. Bernal, the named personal representative and beneficiary of Renee Maria Zintgraff's Last Will and Testament ("Will"), appeals the trial court's order granting summary judgment and the subsequently issued Final Declaratory Judgment in favor of the appellee, Christiane E. Marin, the successor trustee of Zintgraff's Revocable Living Trust ("Trust"). The trial court's decision is based on its interpretation of section 736.0602(3), Florida Statutes (2008), and conclusion that Zintgraff's later-executed Will did not validly revoke her earlier Trust. For the reasons that follow, we reverse.

## Summary of the Underlying Facts

On October 15, 2004, Zintgraff executed the Trust naming herself as the initial trustee and her cousin, Marin, as the successor trustee. The Trust directed that upon Zintgraff's death, a specific bequest of $5,000 was to be distributed to her cousin, Lisa Cardozo, and the remainder of her Trust property was to be equally divided and distributed to the Zoological Society of Florida, Defenders of Wildlife, International Wolf Center, and Parrot Jungle of Miami. Zintgraff funded the Trust with her solely owned residence and with her Wells Fargo brokerage account, both of which were titled in the name of the Trust. It is undisputed that in the Trust, Zintgraff specifically reserved her right to revoke the Trust during her lifetime but that the Trust did not provide a method for revocation of the Trust.

Four years later, on November 8, 2008, Zintgraff met with Sara Saba, an attorney, and executed her Will appointing Bernal as her personal representative and devising all of her tangible personal property and residuary estate to Bernal. The Will reads in pertinent part, "I, RENEE MARIA ZINTGRAFF, a resident of Miami-Dade County, Florida, and a citizen of the United States, declare this to be my Last Will and Testament, revoking all other wills, **trust** and codicils previously made by me." (emphasis added). Although Zintgraff's Will provides that she is revoking her "trust," the Will does not name or specifically refer to the "Renee Maria Zintgraff Revocable Living Trust."

Upon Zintgraff's death in 2013, Bernal filed an emergency petition for administration seeking to admit Zintgraff's Will to probate, and alleging that Zintgraff's real property and the Wells Fargo account were assets of the estate to be distributed pursuant to Zintgraff's Will. The Will was admitted to probate, and Bernal was appointed personal representative of Zintgraff's estate.

Thereafter, Marin filed a complaint seeking a temporary injunction and a declaratory judgment finding that the alleged revocation of the Trust in Zintgraff's Will was ineffectual and that the Trust remained valid. The parties conducted discovery; Marin filed a motion for summary judgment; and after conducting a hearing, the trial court granted Marin's motion and entered a Final Declaratory Judgment in favor of Marin. The trial court concluded that because Zintgraff's

3

Will did not specifically name or expressly refer to the Trust or specifically devise her real property and the Wells Fargo account, the Will did not revoke the Trust and Zintgraff's real property and the Wells Fargo account remained Trust assets to be disbursed according to the Trust.

## Analysis

This appeal presents an issue of first impression, namely the interpretation of section 736.0602(3), "Revocation or amendment of revocable trust," which provides as follows:

> (3) Subject to s. 736.0403(2), the settlor may revoke or amend a revocable trust:
> (a) By substantial compliance with a method provided in the terms of the trust; or
> (b) If the terms of the trust do not provide a method, by:
> 1. A later will or codicil that expressly refers to the trust or specifically devises the property that would otherwise have passed according to the terms of the trust; or
> 2. Any other method manifesting clear and convincing evidence of the settlor's intent.

It is undisputed that the Trust did not provide a method for revocation and thus subsection (a) of section 736.0602(3) does not apply. It is also undisputed that Zintgraff's later Will did not name or expressly refer to the Renee Maria Zintgraff Revocable Living Trust or specifically devise her real property or the Wells Fargo account to Bernal, and therefore, the Will did not comply with subsection (b)(1) of section 736.0602(3). Instead, her Will simply devised all of her tangible personal property and residuary estate to Bernal and declared the Will

4

"to be my Last Will and Testament, revoking all other wills, trust and codicils previously made by me." The question that must be answered in this appeal is whether Bernal may rely on subsection (b)(2) which allows for the revocation or amendment of a trust by "[a]ny other method manifesting clear and convincing evidence of the settlor's intent." The trial court found that the "[a]ny other method" of revocation permitted under subsection (b)(2) does not include a will that fails to satisfy the requirements of subsection (b)(1). We conclude that such a narrow interpretation of the statute is in conflict with the purpose of revocable trusts and the plain language of the statute.

The Florida Supreme Court has specifically recognized that "[a] revocable trust is a unique type of transfer . . . [and] [s]ince [the settlor] is the sole beneficiary of the trust during [the settlor's] lifetime, [the settlor] has the absolute right to call the trust to an end and distribute the trust property in any way [the settlor] wishes." Fla. Nat'l Bank of Palm Beach Cnty. v. Genova, 460 So. 2d 895, 897 (Fla. 1985); Siegel v. Novak, 920 So. 2d 89, 95 (Fla. 4th DCA 2006) (holding that "[t]he central characteristic of a revocable trust is that the settlor 'has the right to recall or end the trust at any time, and thereby regain absolute ownership of the trust property'"). It is this retention of control over the property which distinguishes a revocable trust from other types of conveyances. Genova, 460 So. 2d at 897. Based on the uniqueness of revocable trusts, which includes the

settlor's retention of control over the property and the settlor's absolute right to revoke his or her trust, the Florida Supreme Court concluded in <u>Genova</u> that even the principle of undue influence cannot defeat the settlor's revocation of a revocable trust. <u>Id.</u> at 897-98. The Court therefore concluded that when Mrs. Genova created the revocable trust in question, she "reserved the absolute right to revoke if she were not incompetent. In order for this to remain a desirable feature of a trust instrument, the right to revoke should also be absolute." <u>Id.</u> at 898.

Prior to the enactment of section 736.0602(3) in 2008, there was no statutory mechanism to revoke a trust, but under the common law and section 330(1) of the Restatement of Trusts (Second), the settlor's intent was the polestar for determining whether a revocation of the trust had occurred, and this intent was a question of fact to be resolved by the trier of fact.

Section 330(1) of the Restatement of Trusts (Second) provides:

(1) The settlor has the power to revoke the trust if and to the extent that by the terms of the trust he reserved such a power.

Comment (i) of section 330 of the Restatement of Trusts (Second) further states:

(i) *Where no method of revocation specified.* If the settlor reserves a power to revoke the trust but does not specify any mode of revocation, the power can be exercised in any manner which sufficiently manifests the intention of the settlor to revoke the trust.

Any definitive manifestation by the settlor of his intention that the trust should be forthwith revoked is sufficient. . . .

<u>See also</u> <u>Euart v. Yoakley</u>, 456 So. 2d 1327, 1329 (Fla. 4th DCA 1984) (holding

6

that "the settlor's intention is the polestar by which courts must be guided in determining whether a revocation of an *inter vivos* trust has occurred").

The enactment of section 736.0602(3) has simplified the process somewhat. If the trust provides for a specific method for revocation or if a later will or codicil specifically references the trust and/or specifically devises the property that would have passed under the terms of the trust, then no determination of the settlor's intent is needed to revoke the trust. To revoke or amend a trust without having to prove the settlor's intent, the settlor need only substantially comply with the method provided in the terms of the trust for revoking the trust, § 736.0602(3)(a), or execute "[a] later will or codicil that expressly refers to the trust or specifically devises the property that would otherwise have passed according to the terms of the trust," § 736.0602(3)(b)(1).

However, if either of these two options are not available because either the trust did not specify a method for revocation or there is no later will or codicil that complies with section 736.0602(3)(b)(1), then "[a]ny other method manifesting clear and convincing evidence of the settlor's intent" may be utilized. § 736.0602(3)(b)(2). In other words, section 736.0602(3) established two methods to revoke or amend a trust that if complied with require no evidence of the settlor's intent, and retained the "any other method" mechanism for revocation or amendment of a trust previously found in section 330(1) of the Restatement of

7

Trusts (Second). However, if the "any other method" under section 736.0602(3)(b)(2) is alleged, the proponent must not only prove the settlor's intent, he must do so by clear and convincing evidence.

Thus, based on the clear language of section 736.0602(3), the Florida Legislature has: (1) reduced the burden of establishing a revocation or amendment of a trust if the trust provides for a method to revoke or amend or if a later will or codicil complies with the specific requirement of section 736.0602(3)(b)(1); and (2) increased the burden when neither of these methods is available by requiring clear and convincing evidence of the settlor's intent.

The trial court concluded that the Will, as written, does not and cannot satisfy the clear and convincing evidence requirement to revoke or amend the Trust by "any other method." While it is true that the Will by itself does not reach the clear and convincing evidence threshold, the Will is not the only record evidence of Zintgraff's intent. The record also includes the deposition of Sara Saba, the lawyer who drafted the Will for Zintgraff, and an affidavit submitted by Gary Tacon, a "friend and close confidant" of Zintgraff.

Saba testified in her deposition that she was hired by Zintgraff to draft her Will. During their initial meeting, Zintgraff told Saba "that she wanted to leave everything to [Bernal]." When Saba asked Zintgraff if she had executed any prior wills or created any trusts, Zintgraff told her that there were no prior wills but she

had a trust which she wished to revoke. She explained that since the creation of her Trust, she had developed a very close relationship with Bernal and the Trust no longer represented her wishes with regard to her property. Zintgraff did not provide Saba with any further details about the Trust or a copy of the Trust, which she explained was in Marin's possession.

Saba, a young and relatively new lawyer, explained that she had never revoked a trust before, but she included the language revoking Zintgraff's Trust in the Will because Zintgraff told her she had a Trust and she wanted to revoke the Trust. Saba explained that she did not provide any details in the Will about the Trust because Zintgraff only had one Trust and Zintgraff did not give her a copy of the Trust. Specifically Saba testified: "[Zintgraff] had no other wills, she had a trust, and that's the one that she wanted revoked. I didn't have the trust. I couldn't see the details of the trust but I made sure I – there was only one, and I put the trust in there."

When Saba was questioned about who Zintgraff wanted to be the beneficiary of her estate, she stated the following:

> A.  Do you want the wife of Oscar, do you want anyone else to be a beneficiary? I mean, we went through all of that. And she was like, no, just Oscar.
> Q.  Is there any question in your mind that Renee Zintgraff, by executing the November 11, 2008 will, intended for Oscar Bernal to be the sole beneficiary of her estate?
> A.  Is there any question in my mind?
> Q.  Is there any question in your mind?

9

. . . .

Q. I want to be clear as to what you're saying. Is there any doubt in your mind that it was Renee Zintgraff's intent to revoke the trust that was in place prior to the execution of this will?

A. There's no doubt in my mind at all. She wanted to revoke the trust.

In addition to Saba's sworn deposition testimony, the record includes a sworn affidavit executed by Gary Tacon, Zintgraff's friend and close confidant. Tacon explains in his affidavit that he had known Zintgraff for over forty-four years and that they had remained close until Zintgraff's death. When Zintgraff spoke of her family, which was not often, "it was not in a positive light." Approximately ten years before Zintgraff's death, she called Tacon and asked him whether he would be willing to take possession of her ashes after her death and take them to Alaska and dispose of them into the ocean. Not long after that conversation, Zintgraff sent him a legal document stating her request, which he signed and returned to her. Also not long after that conversation, Zintgraff told Tacon that Bernal had moved into her home and he was helping her with the "day to day things." Throughout the years, Tacon got to know Bernal, who Tacon believed genuinely cared for Zintgraff, and Zintgraff consistently told Tacon how grateful she was to Bernal for everything he had done for her.

Tacon also stated that on several occasions, Zintgraff told him that she intended to leave all of her possessions to Bernal when she died to thank him for all he had done for her over the years. A few years before her death, Zintgraff

10

actually told Tacon that "when I pass, I will rest in peace knowing he [Bernal] is taking care of the house and in turn the house will be taking care of him." Lastly, Tacon stated: "I feel it is a shame that there is litigation surrounding Renee Maria Zintgraff's estate, as I have always known it to be very clear that Renee Maria Zintgraff intended on leaving all of her possessions, including her home to Oscar Bernal."

This evidence, when considered with the Will, is highly compelling evidence of Zintgraff's intent. What this evidence reflects, if unrebutted, is that several years after creating her revocable Trust, Zintgraff decided to revoke her Trust and leave all that she had left (her house and the Wells Fargo account) to Bernal who had lived with her and cared for her for many years. To effectuate her wishes, she hired Saba to draft her Will and revoke her Trust. Saba, a lawyer, who had never revoked a trust before, drafted Zintgraff's Will, included what she believed was the correct language regarding Zintgraff's intent to revoke her one and only Trust and to leave all of her property to Bernal. Zintgraff was clear and unequivocal when she met with Saba and spoke with Tacon, her friend of forty-four years, that she wanted to revoke her Trust and leave all of her possessions to Bernal. However, because the trial court interpreted section 736.0602 to preclude consideration of evidence manifesting Zintgraff's intent under section 736.0602(3)(b)(2), this evidence was not considered.

Such an interpretation of the statute is contrary to the plain language of the statute, the Restatement of Trusts (Second), years of law regarding revocation and amendments to revocable trusts, and logic. Section 736.0602(3)(b)(2) provides that a trust may be revoked or amended by "[a]ny other method manifesting clear and convincing evidence of the settlor's intent." See also Macfarlane v. First Nat'l Bank of Miami, 203 So. 2d 57, 60 (Fla. 3d DCA 1967) ("No magic art is necessary to revoke a trust. . . . [A]ny mode sufficiently manifesting an intention of the trustor to revoke is effective") (emphasis added). If Zintgraff had simply written a letter to Tacon telling him that she no longer wanted to leave $5,000 to Lisa Cardozo and the rest of her property to the four entities listed in her Trust, but, instead, wanted to leave everything to Bernal, or she had scribbled the exact same thing on a napkin or a piece of paper and left it in her dresser drawer, then clearly, the "any other method" provision of section 736.0602(3)(b)(2) would be applicable and evidence of Zintgraff's intent would be admissible. Further, if this evidence clearly and convincingly manifested Zintgraff's intent to revoke her trust, then Zintgraff's intent would be honored. But, under the trial court's interpretation, a will drafted by a lawyer that was then executed by the testator, witnessed and notarized and that says the same thing, may not be considered.

Based on the plain language of section 736.0602 (3) and sheer logic, a settlor may revoke or amend a trust under subsection (3)(a) by substantially complying

12

with the method provided in the terms of the trust, or under subsection (3)(b)(1), if the terms of the trust do not provide a method, by executing a later will or codicil that expressly refers to the trust or specifically devises the property that would otherwise have passed according to the terms of the trust. Under these two methods, no further evidence is required. However, if the settlor revokes or amends his or her trust under the "any other method" provision under subsection (3)(b)(2), then the settlor's intent must be established by clear and convincing evidence.

We, therefore, reverse the Final Declaratory Judgment entered in favor of the appellee and remand for further proceedings consistent with this opinion.

Reversed and remanded.